WESTERN DISTRICT OF ARKANSAS
FILED

APR 13 2026

Ronald E. Dowling
By_____
Deputy Clerk

### IN THE UNITED STATES DISTRICT COURT
### WESTERN DISTRICT OF ARKANSAS
### FAYETTEVILLE DIVISION

| | |
|---|---|
| DR. NAJJA K. BAPTIST            ) | |
| ) | |
| PLAINTIFF,            ) | |
| ) | |
| v.            ) | CASE NO. **26-5077** |
| ) | |
| BOARD OF TRUSTEES OF THE            ) | |
| UNIVERSITY OF ARKANSAS, acting for            ) | |
| and on behalf of the University of            ) | |
| Arkansas, Fayetteville;            ) | **JURY TRIAL DEMANDED** |
| BRIAN RAINES;            ) | |
| CHARLES ROBINSON, in his            ) | |
| official capacity only;            ) | |
| INDRAJEET CHAUBEY, in his            ) | |
| official capacity only;            ) | |
| CALE FESSLER, in his official capacity only  ) | |
| ) | |
| DEFENDANTS.            ) | |

### COMPLAINT FOR DAMAGES, DECLARATORY RELIEF, AND INJUNCTIVE RELIEF

Plaintiff Dr. Najja K. Baptist, by and through counsel, for his Complaint against Defendants, states as follows:

### NATURE OF THE ACTION

1. This case arises from the events that took place after a Black tenured professor and program director reported his new dean for making a racially charged comment regarding Black professionals during a January 2025 virtual meeting.

2. The University of Arkansas did not protect Dr. Najja K. Baptist. It minimized his complaint, softened the witness account, and adopted Dean Brian Raines's version of events.

3.    What followed this report not a neutral employment review by an impartial administrator. It was escalating, and retaliatory, scrutiny: travel and funding restrictions, suspension of Plaintiff's travel card, an audit built on inference rather than neutral fact development, removal of Plaintiff's directorship, formal dismissal proceedings for cause, and a present effort to treat contested accusations as an administrative debt.

4.    Defendants' narrative repeatedly treated overlap between Black religious and civic life and Plaintiff's Black-politics fieldwork as presumptively suspicious. They matched public events to travel dates, overread ambiguous facts, and used cultural unfamiliarity as a substitute for proof.

5.    Defendants also attacked Plaintiff's research materials through non-expert pattern spotting—metadata, repeated phrasing, spelling variations, holidays, and "batch creation"—even though no completed research-misconduct finding existed.

6.    Plaintiff seeks damages, declaratory relief, and immediate equitable relief. He asks this Court to stop unlawful race discrimination and retaliation, to prevent further deprivation of his tenured employment and present wages without due process, and to preserve the status quo while the University attempts to convert a hotly disputed accusation into collection, withholding, offset, or payroll recoupment.

## PARTIES

7.    Plaintiff Dr. Najja Baptist is an adult citizen and resident of Arkansas. At all relevant times, he was employed by the University of Arkansas in Fayetteville, Arkansas as a tenured faculty member in the Department of Political Science and served as Director of African and African American Studies ("AAST"). Additionally, Plaintiff is a Black man.

8. Defendant Board of Trustees of the University of Arkansas governs the University of Arkansas, Fayetteville, which is a public institution of higher education located in Fayetteville, Arkansas. It was Plaintiff's employer and is an "employer" within the meaning of Title VII, 42 U.S.C. § 2000e(b).

9. Defendant Brian Raines was, at all relevant times, Dean of the Fulbright College of Arts and Sciences. He is sued in his individual capacity only for damages under 42 U.S.C. § 1983.

10. Defendant Charles Robinson was, at all relevant times, Chancellor of the University of Arkansas, Fayetteville. He is sued in his official capacity only for prospective declaratory and injunctive relief.

11. Defendant Indrajeet Chaubey was, at all relevant times, Provost and Executive Vice Chancellor for Academic Affairs. He is sued in his official capacity only for prospective declaratory and injunctive relief.

12. Defendant Cale Fessler was, at all relevant times, Associate Vice Chancellor for Financial Affairs. He is sued in his official capacity only for prospective declaratory and injunctive relief.

## JURISDICTION, VENUE AND EXHAUSTION

13. This action arises under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and 42 U.S.C. § 1983 for violations of the Fourteenth Amendment to the United States Constitution.

14. This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343.

15. This Court has authority to award declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202 and Federal Rule of Civil Procedure 65.

16. Venue is proper in this District and Division under 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e-5(f)(3) because the unlawful employment practices and constitutional deprivations alleged herein occurred in the Western District of Arkansas, and Defendants reside and operate here.

17. Plaintiff timely filed EEOC Charge No. 493-2025-02619 against the University of Arkansas.

18. On January 13, 2026, the EEOC issued a Dismissal and Notice of Rights. A true and correct copy is attached as **Exhibit 1**.

19. Plaintiff received the notice on or about January 13, 2026, and this action is filed within ninety days of receipt.

20. All conditions precedent to Plaintiff's Title VII claims have been satisfied, performed, or have occurred.

21. To the extent some retaliatory acts alleged herein occurred after the filing of Plaintiff's EEOC charge or after issuance of the right-to-sue notice, those acts are part of the same retaliatory course of conduct, are pleaded as ongoing and post-charge retaliation and present injunctive harm, and Plaintiff reserves the right to supplement or amend as necessary.

## FACTUAL ALLEGATIONS

*A. Plaintiff's Position, Scholarship, and Early Complaints*

22. Plaintiff is a scholar of Black political participation and Black public life. His work includes qualitative, community-based field research in Black churches, Black civic institutions, and other spaces where political attitudes, organization, and participation are formed and expressed.

23. At all relevant times, Plaintiff held a tenured faculty appointment at the University and served as Director of AAST.

24. In late 2024 and early 2025, Plaintiff's relationship with Raines and administrators in the dean's office deteriorated in connection with disputes involving a program assistant and the handling of Plaintiff's concerns.

25. Plaintiff complained that Donna Johnson's notetaking and recordkeeping in meetings were biased, incomplete, and unreliable. Those concerns mattered because University officials later relied on Johnson's notes to validate Raines's version of disputed events.

26. During this same general period, the workplace environment was causing Plaintiff serious stress. Plaintiff submitted an ADA-related complaint in Fall 2024 concerning the health effects of the hostile and toxic work environment, including elevated blood pressure and related health concerns.

27. The University was therefore on notice, before the main events of 2025 unfolded, that Plaintiff believed he was being treated unfairly and that the environment was affecting his health.

   B. *The January 2025 Puerto Rico Incident and Plaintiff's Complaint*

28. On or about January 6, 2025, while attending the Southern Political Science Association conference in Puerto Rico, Plaintiff participated in a virtual meeting involving Raines and other University personnel.

29. During that call, Plaintiff understood Raines to make a race-based leadership remark directed at him, in substance disparaging Black leadership and suggesting that Black faculty or Black managers did not know how to handle stress or could not be trusted with leadership.

30. Plaintiff immediately understood the remark as race-based and as directed at him as a Black faculty member and Black academic leader.

31. Dr. Periloux Peay, a research collaborator and faculty member at the University of Maryland, was seated nearby during the Puerto Rico conference and later told University investigators that he overheard a "problematic" comment made by Raines. Peay said he did not recall the exact words, but remembered something like, "This is why people can't be trusted with leadership," and understood the comment as directed at Plaintiff's leadership abilities. Whatever the exact phrasing, multiple listeners interpreted the comment to be a veiled, disparaging comment towards professionals in the Black community.

32. The University's own October 28, 2025, OEOC memorandum later recorded Peay as recalling something like "This is why people can't be trusted with leadership"—a formulation that, from Plaintiff's perspective, softened and incompletely captured what had been said.

33. On January 17, 2025, Plaintiff reported the incident to Chancellor Robinson by email. In the University's later written determination, the University acknowledged that Plaintiff wrote it was "particularly troubling" that Dean Raines had made disparaging statements suggesting that Black faculty did not know to handle stress.

34. Plaintiff also complained through the University's equal-opportunity/compliance channels about Raines's conduct.

35. On or about January 22, 2025, at an in-person meeting attended by Dr. Valandra, Raines used a tone that Valandra later described to University investigators as "very patronizing" and "like father knows best." From Plaintiff and Dr. Valandra's perspective, this was part

of the same pattern of racialized and discriminatory treatment Raines exhibited when he treated Baptist, a Black academic leader, as someone who did not belong in a position of authority.

36. Plaintiff experienced this conduct as racially hostile, demeaning, and threatening to his position.

   C. *June and July 2025: Escalating Scrutiny and Immediate Adverse Action*

37. Upon information and belief, certain travel-related charges were identified by Department Chair Bill Schreckhise and reported to Associate Dean Stephanie Schulte on or about June 23, 2025.

38. Upon information and belief, Dean Raines and others in the Fulbright dean's office were either contemporaneously aware of this report, or were made aware at this time.

39. Following consultation with legal counsel, a report was submitted on June 30, 2025, under Ark. Code Ann. § 25-1-124 based on an asserted need to report an apparent loss of public funds within five business days.

40. On July 3, 2025, Plaintiff was called into a meeting with Raines and other University officials concerning his travel, research, and expenditures.

41. In that meeting, Raines presented accusations of financial wrongdoing or misuse tied to Plaintiff's June 7, 2025, Columbia, South Carolina event, related Pawley's Island travel, IRB issues, and other matters.

42. During the same period, Defendants suspended Plaintiff's University travel, suspended his University travel card, and cut off or froze access to travel and support funding.

43. Plaintiff was pressed to produce supporting materials and publishable research on an unrealistic timetable. He responded immediately with what was then available, including field notes and witness information.

44. On July 3, 2025, Plaintiff identified Dr. Joe Grant as a South Carolina coordinator and corroborating witness who, according to Plaintiff, had helped facilitate Plaintiff's May and June fieldwork and could also help explain any mistaken charges associated with the travel.

45. On July 11, 2025, University officials held a follow-up meeting. Plaintiff again denied wrongdoing and explained that participant confidentiality, qualitative methods, and the form of his field materials were all relevant factors constraining how quickly and in what form he could provide supporting documentation.

46. Plaintiff further maintains that Raines and other decisionmakers repeatedly treated Black churches, Black community spaces, and overlap between Black religious life and Black-politics fieldwork as inherently suspicious.

47. The stress of the July 2025 escalation became acute enough that Plaintiff sought hospital care for stress-related abdominal pain.

48. These July 2025 meetings were materially adverse and punitive. They branded Plaintiff's work suspect, stripped him of travel and funding support, and set in motion the campaign that culminated in his removal from leadership, proposed dismissal, and threatened recoupment.

49. By Summer 2025, area-studies programs, including AAST, were already under administrative pressure, and Plaintiff and other directors were raising concerns about unilateral changes, lack of consultation, and marginalization.

50. On October 28, 2025, the University's Equal Opportunity, Compliance, and Title IX office issued a written memorandum of determination concluding that Raines had not violated the University's discrimination policy, based only on recollections and meeting notes by Raines and Donna Johnson and a misrepresentation of testimony by Dr. Periloux Peay. A true and correct copy is attached as **Exhibit 2**.

51. That memorandum adopted Johnson's note-based narrative, minimized or reframed witness accounts, and concluded that Plaintiff's race-discrimination and retaliation allegations were unfounded.

52. The memorandum further recommended that Plaintiff be reminded of the University's ethical-reporting expectations, thus repositioning Plaintiff, rather than Raines, as the person whose conduct needed correction.

53. By ratifying the Dean's version and discounting Plaintiff's report the University helped create the conditions for the retaliatory escalation that followed.

   D. *The Gala-Wedding Issue was Contested, and the University's Own Materials Reflect a Mixed Record*

54. The University's July 31, 2025, Summary of Information for Referral to Internal Audit identified South Carolina-related concerns totaling approximately $30,135.84 and expressly framed them as matters meriting further review. A true and correct copy is attached as **Exhibit 3**.

55. By March 2026, the University had increased the asserted apparent loss to $48,344.26.

56. The University's own materials reflected that Plaintiff had described the June 7 event in official University paperwork as a focus group or community meeting connected to his research and had estimated approximately 75 participants.

57. Specifically, the referral summary reflected that Plaintiff's spend authorization and expense material stated that he would be traveling to conduct research for the Blair Center, and that his official function form described the Gala Event Center event as a focus group and community meeting designed to facilitate productive discussions and gather input from research subjects.

58. The same materials reflected Plaintiff's position that participants were contacted individually rather than through broad invitations or public advertising because of confidentiality concerns.

59. The referral materials also reflected that Plaintiff identified a participant email consistent with research activity and provided or referenced corroborating material from Dr. Grant, who described himself as Plaintiff's local coordinator for recruiting subjects for focus groups in South Carolina.

60. The referral materials further reflect Plaintiff's position that a single charge had been made separately and by mistake.

61. In addition, the same file referenced a participant email and a Dr. Grant email that were consistent with research activity having occurred.

62. Yet rather than investigate those avenues fairly, Defendants relied heavily on overlap between wedding plans and research travel, social-media imagery, venue décor, public event matching, server recollections and adverse inferences.

63. That approach converted a disputed and fact-specific event into a predetermined narrative of personal misuse and dishonesty.

64. Plaintiff does not concede fraud, theft, or intentional misuse of funds. He alleges that the University's version of the June 7 event is selective and incomplete, that corroborating

witnesses existed, and that the University repeatedly overread ambiguous facts to support a disciplinary result it had already begun to embrace.

65. Even the University's own referral materials recognized that a spouse's presence in shared lodging, at no additional expense to the University, is not by itself prohibited in otherwise bona fide University travel.

E. *Black Religious and Community Overlap Was Treated as Suspicious*

66. A substantial part of the University's accusation rested on travel connected to United House of Prayer ("UHOP") and other Black religious or civic spaces that the University never actually proved were improper.

67. Instead, Defendants matched church or community events to travel dates and locations and inferred that Plaintiff must have been traveling in a personal or private capacity rather than a research capacity.

68. For Plaintiff's scholarship, Black churches and related civic institutions are not incidental. They are among the very spaces where Black political behavior, organization, and attitudes are formed, expressed, and studied.

69. The University's response to that explanation was not to neutrally test it through qualified methods, witnesses, or trip specific factual development. The response was to treat "UHOP" and other Black religious/community overlap as red flags.

70. The record assembled by Defendants does not show that Plaintiff held compensated outside employment through UHOP, personally profited from the trips at issue, or corrupted any University decision through a private financial interest.

71. To the extent Defendants sought to use Plaintiff's ministerial or religious affiliation against him, that affiliation was not a paid outside job.

72. Attendance at worship, ministry, or Black community events while traveling does not, standing alone, convert research travel into theft, fraud, or dismissal-level misconduct.

73. Plaintiff alleges that Defendants' repeated treatment of Black church and Black community overlap as inherently suspicious was part of the same race-based stereotyping that had already surfaced in the January 2025 leadership remark.

### F. The IRB Record Was More Complicated Than Defendants Claimed

74. Defendants also tried to use Institutional Review Board, or IRB, issues as if they conclusively proved bad faith.

75. But the University's own referral materials reflected that, on July 15, 2025, the IRB coordinator found a single instance of non-compliance with institutional policy that was neither serious nor continuing, that no regulations had been violated, and that no sanctions were recommended.

76. The same materials reflected that the lead institution on a multi-institution project had an exempt determination in place during the relevant period, and that a University of Arkansas reliance agreement recognizing that determination was pending.

77. Even on the University's own paperwork, the IRB issue was administratively messy and contested, not clean proof of fraud, fabrication, or intentional misuse of funds.

78. Defendants nevertheless continued to wield IRB rhetoric as if it resolved the larger misconduct dispute against Plaintiff.

### G. The University Later Formalized Its Support for Raines

79. The October 28, 2025, the University's Equal Opportunity, Compliance, and Title IX Office Memorandum of Determination concluded that Raines had not violated the University's discrimination policy.

80. That memorandum reframed the January 2025 incident as a dispute over stress-management language, relied on Johnson's notes as validation of Raines's account and treated Plaintiff's race complaint as having "evolved."

81. By rejecting Plaintiff's complaint and adopting Raines's narrative, the University ratified the very official whose conduct Plaintiff had reported and helped clear the path for the later audit, disciplinary escalation, and dismissal process.

*H. Plaintiff Submitted Materials in Good Faith, and the University Immediately Circulated Them Internally*

82. On October 1, 2025, Internal Audit provided Plaintiff with a detailed spreadsheet of questioned travel and invited him to respond.

83. Plaintiff responded on October 15, 2025.

84. In early December 2025, Internal Audit informed Plaintiff's counsel that they were preparing to conclude the investigation against Dr. Baptist, again requested that Plaintiff provide supporting materials, and represented that his supplemental submission would be reviewed before the report was finalized.

85. Internal Audit further represented that if Plaintiff provided supporting materials, University management would review them and any changes deemed necessary would be reflected in the draft internal audit report.

86. On December 15, 2025, Plaintiff, through counsel, submitted a substantial file of research-related materials in good faith, including anonymized and aggregate documentation and contextual material designed to respect participant privacy and research-ethics constraints. A true correct copy of Plaintiff's submission is attached as **Exhibit 4**.

87. That same day, Chris Walker, the University of Arkansas System's Internal Audit Director, forwarded Plaintiff's submission internally to Raines, Schulte, Schreckhise, Bill Kincaid and others for review. A true and correct copy of that December 15, 2025, transmittal email chain is attached as **Exhibit 5**.

88. The University cannot characterize Plaintiff as someone who ignored the process or refused to respond.

89. Plaintiff's position throughout the process was that he was attempting to comply in good faith while also respecting confidentiality and the realities of qualitative field research.

90. Even so, Defendants later behaved as though the audit had effectively been settled long before Plaintiff's December submission was neutrally absorbed and evaluated.

   I. *The University's Research Attack Relied on Non-Expert Pattern Spotting, not a Completed Misconduct Finding*

91. In March 2026, the University's Art and Sciences review attacked Plaintiff's December 2025 submission using a multi-office assessment emphasizing repeated content, polished phrasing, spelling variations, holiday input dates, metadata, and "batch creation."

92. Those observations were then used to support the conclusion that the documents were not valid evidence of research purpose.

93. No completed research-misconduct finding existed, however. No neutral expert panel had concluded that Plaintiff fabricated data, and no plagiarism finding or finding of formal research misconduct of any kind had been made.

94. Defendants nevertheless treated administrative pattern spotting as if it conclusively established dishonesty and as if the separate research-misconduct process had already been decided against Plaintiff.

95. That was not a neutral or expert-led adjudication. It was an administrative effort to convert suspicion into certainty.

96. Defendants also failed to meaningfully resolve obvious corroborating paths before escalating to dismissal and recoupment.

97. Defendants also failed to meaningfully test obvious exculpatory and corroborating avenues. They did not interview Dr. Grant. They did not seek methods testimony from Dr. Peay or other ethnographers. They did not neutrally test Plaintiff's account that the Gala space had been used for research-related activity after the ceremony. They instead treated adverse inferences as findings.

J. *The March-April 2026 Audit, Directorship Removal, and Dismissal Escalation*

98. On March 12, 2026, Raines sent a transmittal recommendation to Robinson and Chaubey recommending Plaintiff's dismissal for cause. A true and correct copy is attached as **Exhibit 6**.

99. Also on March 12, 2026, Raines sent Plaintiff a detailed grounds letter invoking theft, intentional misuse of property, University policy violations, professional dishonesty or plagiarism, unethical conduct, and a detrimental pattern of conduct. A true and correct copy is attached as **Exhibit 7**.

100. The March 12 grounds letter stated that Plaintiff was not being suspended from faculty employment at that moment, but it kept the July 2025 travel, travel-card, and funding restrictions in place and required him to continue performing his faculty duties while the matter remained pending.

101. The same March 12 letter ended Plaintiff's services as AAST Director effective immediately, returned him to a nine-month academic appointment, removed his administrative stipend, and shifted his workload.

102. On March 16, 2026, Robinson wrote that he agreed with Raines's recommendation and was initiating formal proceedings to consider dismissal for cause. A true and correct copy is attached as **Exhibit 8**.

103. The March 16 letter required Plaintiff to request a hearing and submit a written answer within two weeks of mailing.

104. On March 25, 2026, Plaintiff, through counsel, submitted written requests seeking review and a stay of related adverse actions, including a formal request that disciplinary actions affecting compensation and workload be stayed pending meaningful review.

105. In subsequent correspondence dated April 1, 2026, Robinson asserted that Plaintiff had not yet provided an adequate written answer under Board Policy 405.1, but also acknowledged that the separate research-misconduct referral remained under review and no action had yet been taken on it.

106. That same correspondence nevertheless asserted that the audit findings were final and had been accepted by the Board of Trustees.

107. Robinson further states that if he did not receive a written answer by 5:00 p.m. on Monday, April 6, 2026, the matter would be concluded and Plaintiff's last day of employment would be Monday, April 6, 2026.

108. On April 6, 2026, Plaintiff submitted a detailed written answer and renewed his request for a formal hearing. A true and correct copy is attached as **Exhibit 9**.

109.    In that written answer, Plaintiff denied that cause existed, denied that the University had proved theft, dishonesty, or dismissal-level misconduct, and explained why the record was incomplete, selective, and inference-driven.

110.    The University's own correspondence thus simultaneously maintained that the research-misconduct referral was unresolved while treating the audit and dismissal narrative as effectively settled. A true and correct copy is attached as **Exhibit 10**.

111.    Plaintiff has continued to contest the allegations and to seek meaningful neutral process. Defendants have continued to maintain the challenged restrictions, compensation consequences, and threat of additional deprivation while that process remains unsettled.

K. *The Recoupment Threat is Live and Supports Immediate Relief*

112.    On March 9, 2026, Internal Audit issued its report regarding Plaintiff's travel and related expenditures. According to the University's later correspondence, the report had been accepted by the Board of Trustees. A true and correct copy is attached as **Exhibit 11**.

113.    The audit quantified an asserted apparent loss of $48,344.26, recommended that the Dean seek reimbursement, and set March 31, 2026, as the target date for reimbursement and invoicing.

114.    Before any neutral faculty hearing had occurred, the University was thus treating a hotly contested accusation as a presently quantifiable debt.

115.    The University's later correspondence also repeatedly treated the audit findings as "final" and "accepted," reinforcing that Defendants were moving the dispute from allegation to collection posture.

116.    Upon information and belief, Defendants have moved or are moving toward reimbursement demands, invoicing, offset, withholding, payroll deduction, or related

collection activity based on that disputed audit amount. A true and correct copy of the Treasurer's Office correspondence is attached as **Exhibit 12**.

117. The amount defendants seek to collect is not an admitted debt and is not a liquidated amount established through a fair, neutral adjudication. It remains disputed at every material level.

118. Defendants cannot constitutionally transform a hotly disputed, procedurally tainted, inference-driven accusation into a present property deprivation and begin taking or threatening to take Plaintiff's wages while the underlying misconduct allegations remain contested.

119. The recoupment threat is therefore live and imminent, and it supports immediate equitable relief.

120. As a direct and proximate result of Defendants' conduct, Plaintiff has suffered and continues to suffer loss of professional standing, loss of leadership status and compensation, interference with research and travel, emotional distress, financial uncertainty, and stress-related physical symptoms.

## COUNT I
Title VII Race Discrimination
(Against Defendant Board of Trustees of the University of Arkansas)

121. Plaintiff realleges and incorporates by reference Paragraphs 1 through 121 as though fully set forth herein.

122. Plaintiff was qualified for his position and at all relevant times held a tenured faculty appointment.

123. The University subjected Plaintiff to adverse employment actions, including suspension of University travel, suspension of his travel card, restriction of funding and support, removal

from the AAST directorship, initiation of for-cause dismissal proceedings, continuation of punitive restrictions while he was expected to keep working, and the use of the audit as a basis for reimbursement and collection efforts.

124. Plaintiff's race was a motivating factor in those actions and a but-for cause of at least some of them.

125. The January 2025 race-based leadership remark, Plaintiff's contemporaneous report to the Chancellor about disparaging statements suggesting Black faculty did not know how to handle stress, and Peay's corroborating recollection support discriminatory motive.

126. The University's asserted reasons were also pretextual. It ignored or downplayed corroborating evidence, softened witness accounts unfavorable to Raines, repeatedly treated Black churches and Black community spaces as inherently suspicious, and converted ambiguous and disputed facts into a predetermined narrative of misconduct.

127. As a direct and proximate result, Plaintiff has suffered damages.

### COUNT II
Title VII Hostile Work Environment

128. Plaintiff realleges and incorporates by reference Paragraphs 1 through 128 as though fully set forth herein.

129. Plaintiff was subjected to unwelcome race-based conduct, including the January 2025 leadership remark, repeated race-coded criticisms suggesting Black faculty or Black managers could not handle stress or leadership, and subsequent patronizing and demeaning treatment by Raines in the wake of Plaintiff's complaint.

130. The hostile environment was compounded when Defendants later treated Plaintiff's Black-centered fieldwork and overlap with Black church and community spaces as inherently suspect rather than engaging with them neutrally.

131. Taken together, and especially given Raines's position as Plaintiff's dean and the employment consequences that followed, the conduct was sufficiently severe or pervasive to alter the terms and conditions of Plaintiff's employment and created an objectively and subjectively hostile work environment.

132. The University knew about the conduct because Plaintiff reported it to the Chancellor and through University compliance channels.

133. The University did not take prompt and appropriate remedial action. Instead, it adopted Raines's version of events and reinforced the hostile environment.

134. As a direct and proximate result, Plaintiff has suffered damages.

## COUNT III
### Title VII Retaliation

135. Plaintiff realleges and incorporates by reference Paragraphs 1 through 135 as though fully set forth herein.

136. Plaintiff engaged in protected activity when he complained about Raines's race-based conduct to the Chancellor and through the University's equal-opportunity/compliance channels, and later when he pursued EEOC relief.

137. The University was aware of Plaintiff's protected activity.

138. After that protected activity, the University subjected Plaintiff to materially adverse actions, including escalating scrutiny, the July 2025 hostile investigative meetings, suspension of travel, suspension of his travel card, restriction of funding and support, the audit escalation, removal from the AAST directorship, reduction in compensation, initiation of for-cause dismissal proceedings, the demand for an accelerated written answer under threat of immediate separation, and use of a disputed audit as the basis for reimbursement and collection.

139. Those actions would dissuade a reasonable employee from reporting discrimination.

140. The timing, sequence, and character of the University's response support causation. So does the University's choice to turn Plaintiff's complaint into an apparent credibility issue while embracing Raines's narrative.

141. Even if financial concerns furnished Defendants with a pretextual opening, retaliation helped drive the scope, severity, and outcomes of what followed.

142. As a direct and proximate result, Plaintiff has suffered damages.

## COUNT IV
42 U.S.C. § 1983 – Equal Protection (Racial Discrimination)
(Against Defendant Board of Trustees of the University of Arkansas, acting for and on behalf of the University of Arkansas, Fayetteville, and Defendant Brian Raines in his Individual Capacity and Defendants Charles Robinson and Indrajeet Chaubey in their Official Capacities for Prospective Declaratory and Injunctive Relief Only)

143. Plaintiff realleges and incorporates by reference Paragraphs 1 through 143 as though fully set forth herein.

144. At all relevant times, Raines acted under color of state law.

145. Plaintiff is a member of a protected racial class.

146. Raines intentionally discriminated against Plaintiff because of race, including by making the January 2025 leadership remark, targeting Plaintiff after he complained, and helping drive a course of adverse action that treated Plaintiff's Black leadership and Black-centered fieldwork as suspect.

147. The discriminatory treatment described herein was purposeful, not accidental or merely negligent.

148. Robinson and Chaubey are proper official-capacity defendants for prospective declaratory and injunctive relief because they are responsible for implementing, carrying forward, or

refusing to halt the ongoing effects of the discriminatory campaign, including the dismissal process and related employment restrictions.

149.    As a direct and proximate result of the equal-protection violation, Plaintiff has suffered damages and continues to face irreparable injury.

150.    Plaintiff is entitled to damages against Raines in his individual capacity and to prospective declaratory and injunctive relief against Robinson and Chaubey in their official capacities.

## COUNT V
### 42 U.S.C. § 1983 – Procedural Due Process
(Against Defendant Board of Trustees of the University of Arkansas, acting for and on behalf of the University of Arkansas, Fayetteville, and Defendant Brian Raines in his Individual Capacity and Defendants Charles Robinson and Indrajeet Chaubey in their Official Capacities for Prospective Declaratory and Injunctive Relief Only)

151.    Plaintiff realleges and incorporates by reference Paragraphs 1 through 151 as though fully set forth herein.

152.    Under the University's tenure-related policies, including the policies Defendants themselves invoked, Plaintiff had and has a protected property interest in his tenured faculty appointment and continued employment absent dismissal for cause through constitutionally adequate procedures.

153.    Plaintiff also has a protected property interest in his wages, salary, and compensation, which cannot be involuntarily deducted, withheld, or offset on the basis of a disputed accusation without constitutionally adequate process.

154.    Defendants deprived Plaintiff, or threatened to deprive him, of those interests without constitutionally adequate process.

155.    Among other things, Defendants:

a. treated the audit as final and accepted before any neutral hearing tested the disputed allegations;

b. removed Plaintiff from his directorship and reduced him compensation while the matter remained contested;

c. maintained travel, travel-card, and funding restrictions as punitive pressure;

d. attempted to force an accelerated written-answer process under threat of immediate separation;

e. used unresolved research and IRB issues as if they had already been conclusively adjudicated against Plaintiff; and

f. moved to treat a disputed accusation as a presently quantifiable debt subject to reimbursement, invoicing, withholding, offset, payroll deduction, or related collection.

156. Due process does not permit state officials to convert a disputed, inference-driven accusation into a presently due liquidated debt and to initiate collection from a tenured professor's wages before a meaningful opportunity to be heard before a neutral decisionmaker.

157. Raines personally set this deprivation in motion and helped structure the tainted record on which it rests.

158. Robinson and Chaubey are proper official-capacity defendants because they are responsible for the ongoing dismissal process and for preserving or withholding the status quo while Plaintiff seeks meaningful process.

159. Fessler is a proper official-capacity defendant because, on information and belief, he has responsibility for or authority over the collection, withholding, offset, or payroll-deduction machinery that threatened Plaintiff's wages.

160. Plaintiff is entitled to declaratory and injunctive relief preventing further deprivation of his employment and wages without due process, and to damages against Raines in his individual capacity.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in his favor and grant the following relief.

A. Declare that Defendant Board of Trustees of the University of Arkansas violated Title VII by discriminating against Plaintiff because of race, retaliating against him, and subjecting him to a racially hostile work environment;

B. Declare that Defendant Raines violated Plaintiff's rights under the Equal Protection and Due Process Clauses of the Fourteenth Amendment;

C. Enter temporary, preliminary, and permanent injunctive relief preserving the status quo and prohibiting Defendants, and those acting in concert with them, from initiating or continuing any recoupment, withholding, offset, payroll deduction, invoicing, or other collection activity against Plaintiff based on the disputed audit amount unless and until lawful process occurs;

D. Enter temporary, preliminary, and permanent injunctive relief prohibiting Defendants from finalizing Plaintiff's dismissal, or imposing further punitive employment action based on the challenged audit and dismissal record, unless and until Plaintiff receives constitutionally adequate process;

E. Order equitable relief restoring or preserving Plaintiff's compensation, benefits, workload, research and travel support, and, to the extent lawful and appropriate, his leadership status or comparable equitable relief pending lawful resolution of the dispute;

F. Award Plaintiff back pay, lost benefits, lost compensation, and all other pecuniary losses;

G. Award compensatory damages in an amount to be determined by the jury;

H. Award punitive damages against Defendant Brian Raines in his individual capacity;

I. Award nominal damages as appropriate on Plaintiff's constitutional claims;

J. Award prejudgment interest, post-judgment interest, attorney's fees, litigation expenses, and costs under all applicable statutes, including 42 U.S.C. § 2000e-5(k) and 42 U.S.C. 1988; and

K. Award such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: April 13, 2026

Respectfully submitted,
Dr. Najja K. Baptist
BY: /s/
John Jerome "JJ" Thompson Sr.
Bar No: 2024182
Thompson DeSonier Law Firm
294 N. Main St.
Cave Springs, AR 72718
Office: 479-844-4086
JJ@tdfirm.law
Attorney for Plaintiff