# UNIVERSITY OF ARKANSAS

*Equal Opportunity, Compliance, and Title IX*

October 28, 2025

**To:**   Dr. Indrajeet Chaubey
Provost

**From:** CJ Moseby,
EO & TIX Investigator

**RE:**   Memorandum of Determination – Case # 00094-2025

## Background

On or around July 11, 2025, the Equal Opportunity and Title IX Office (EO/TIX) received a report from Dr. Najja Baptist, Director of the African American Studies Program, alleging misconduct against Dr. Brian Raines, Dean of the Fullbright College of Arts and Sciences. The report alleges that Dean Raines' conduct potentially constitutes discrimination on the basis of Race and Retaliation in violation of the University's Non-Discrimination Policy, as outlined in Fayetteville Policies and Procedures (FPP) 214.1.

Pursuant to FPP 214.1, the University's policy prohibiting discrimination (including discriminatory harassment) in employment, education, programs, and services, I conducted a review to assess whether Dean Raines may have engaged in conduct that constituted discrimination or discriminatory harassment under the policy. FPP 214.1 provides the following definitions:

1. Discrimination: Discrimination is adverse action based upon an individual's actual or perceived association with a protected class. Disparate treatment occurs when an individual suffers less favorable treatment than others because of a protected class. Disparate impact occurs when a policy, although neutral on its face, adversely impacts persons in a protected class.

2. Discriminatory Harassment: (1) Unwelcome, protected class-based verbal, written or physical conduct that (2) is sufficiently severe or pervasive that (3) it unreasonably interferes with, denies, or limits an individual's ability to participate in or benefit from the University's education or employment programs or activities; and (4) the creation of an intimidating, hostile, or offensive environment.

## Summary of Collected Information

1

UNIVERSITY OF
ARKANSAS

*Equal Opportunity, Compliance, and Title IX*

## Interview Overview— Dr. Najja Baptist's allegations

- Baptist alleges that, in November 2024, he reported Assistant Dean of People Operations Donna Johnson to OEOC for "improper and biased notetaking" during meetings about a program assistant.
- Baptist alleges that, on a date between January 8-11, 2025, Raines made "racially disparaging remarks," stating "black people are incapable of leadership" during a video meeting while he (Baptist) was at a conference in Puerto Rico, and that Dr. Perilous Peay, a research partner and peer from another university, was a witness to that statement.
- Baptist states that, on January 17, 2025, he reported Raines's alleged racist comment to Chancellor Charles Robinson via email and provided the email as evidence. Raines denied making the statement during a meeting convened by Compliance Officer Dr. Danielle L. Williams.
- Baptist alleges that, in a subsequent meeting, still sometime in January 2025, Dean Raines was "so condescending" that Dr. Valandra, School of Social Work professor, had to "point out his racial overtones and loudness," and Dr. Valandra could be a witness to this. Shortly afterwards, Raines allegedly offered Baptist an endowment "as a way to appease him."
- On June 16 and 27, 2025, contract changes were made without consulting the area directors of diversity groups. Raines allegedly refused to meet with all the area directors as a group but held an individual meeting with Baptist in July 2025.
- Baptist asserts that, on June 27, 2025, Raines used the word "civil" in email communication, which Dr. Baptist saw as "racially charged language based on 15th-century discourse."
- Baptist alleges that, as retaliation, on July 2, 2025, Raines texted him on his personal phone, which he claims he never gave him, to schedule a "Hostile Meeting" on July 3, 2025.
- On July 3, Raines accused Baptist of financial misconduct during a Teams meeting with Dean of People Operations, Donna Johnson, Fulbright Department Chair Bill Schreckhise, and Associate Dean for Social Sciences Stephanie Schulte, alleging misuse of research funds for his wedding, faking a focus group, questioning IRB approval (required for human subject research), and hiding an old arrest. As adverse action, Raines allegedly called Baptist "unethical and immoral," threatened termination, revoked his travel card, suspended his endowment, and demanded defense documents in 24 hours. Baptist provided an audio recording as evidence.
- Baptist claims that on July 10, 2025, he went to the hospital for "abdominal pain due to stress from this situation." He denies any wrongdoing related to financial improprieties.
- Baptist alleges that, on July 11, 2025, Raines held a second "Hostile Meeting," escalating adverse actions and discrimination. Raines doubted Baptist's explanations, allegedly made disparaging remarks about Black churches—questioning a baptismal pool—and said Baptist's tone was "different" and "less believable." Raines also allegedly engaged in "e-snooping" by using Baptists' wedding photos from social media to impeach Baptists' statements. Baptist reports that the meeting ended with threats of internal review or immediate termination. Baptist submitted an audio recording as evidence.

2



UNIVERSITY OF
ARKANSAS

*Equal Opportunity, Compliance, and Title IX*

**Interview Overview— Dean Raines' response**

- Regarding the November 2024 allegation, Raines said he was unaware of the report Baptist made to OEOC about Donna Johnson, Associate Dean of People Operations.
- Raines denies the January 2025 allegation, stating the claim is false. He explained that Baptist's statement that he said, "black people were incapable of leadership," evolved from Baptist first alleging he said, "black people needed to learn how to manage their stress," then claiming he made a racial slur. Instead, Raines said he told Baptist, "People in leadership or management in the college must manage stressful situations well; we need to be the calmest people in the room," after Baptist had mishandled a situation involving his then-program assistant, Morgan Reese. He added that it's a message he shares with all program leaders when needed.
- In a subsequent meeting around January 22, Raines claims Baptist admitted that he didn't say the racially disparaging remark, but said it was instead how he *perceived* Raines' words as a Black man.
- On the endowment: States Baptist's department nominated him for scholarly merit, noting it wasn't offered as appeasement, "The guy's scholarly record is quite strong." Timing was coincidental—he isn't involved in the nomination process; he accepts the recommendation and appoints the winner.
- Regarding the Allegations for June 16-27, 2025, Raines stated that he met with the group of area directors once as the new Dean of Fullbright College and subsequently decided on individual meetings, as the departments have vastly different needs.
- For the June 27, 2025, allegation, Raines says he was surprised by Baptist's interpretation of his use of the word "civil" and defends his comments, stating that "civil discourse is something we should all strive for."
- At the July 3, 2025, meeting, Raines explained he was notified by those within his chain of command about suspected fund misuse and involved legal counsel, as state law requires reporting within five days. He followed a script, asking questions instead of accusing, and gave Baptist 4 days, not 24 hours, to produce evidence. Raines emphasizes that all actions he took, including suspending Baptist's spending, were standard procedures for addressing spending irregularities. He denies calling Baptist "unethical and immoral," stating that he was reading from the policy.
- At the July 11, 2025, follow-up, Raines reviewed Baptist's evidence, found it unconvincing compared to new photographic evidence supporting the wedding reception theory, and called the evidence produced by Raines "extremely weak"—such as a few illegible hotel letterhead notes from over 70 people and refusing to share participants' names. Raines denied disparaging black churches, referred the matter to internal audit for independent review, and noted Baptist provided evidence of reporting his arrest to the previous dean but lacked IRB approval.
- Overall, Raines denies racial bias or retaliation. He believes Baptists' initial allegations arose from his refusal to support Baptist's unreasonable firing of his Program Assistant, Morgan Reese, and that the retaliation claims may stem from the financial probe. He states he had no choice but to investigate: "It's the law... I do it a hundred percent of the time,"



expressing sadness and concern for Baptist as a talented scholar who may have made some bad decisions.

### Interview Overview— Valandra's comments as a witness in the meeting on September 11, 2025

- Dr. Valandra, a faculty member of the School of Social Work, said that Raines started the meeting with what she called a lecture on university policies and procedures, using a tone that was "very patronizing" and "like father knows best, talking to children instead of adults."
- She said that when she confronted him about his tone, Raines showed her his agenda list, revealing that the main issue they had come to discuss was at the bottom. Valandra felt this was like a "bait and switch"—subjecting them to criticism before addressing the real issue they were there to discuss (the issue with Baptist's program assistant, Morgan Reese).
- After she called Raines out on his behavior, she said he became "kind of defensive" and mentioned that he tries to be aware of his biases. He also mentioned books he'd been reading on Black American history, accepted Dr. Baptist's book recommendation on racism, and otherwise maintained a collegial and professional tone throughout the meeting.
- When describing Baptist's behavior during the meeting, she said he became "very angry and frustrated," especially "upset" about the decision that Morgan Resse would not be let go entirely, but would stay on his program's payroll, and Baptist "raised his voice" to Raines when sharing his perspective on this issue.
- When Baptist became angry and raised his voice, Raines stood up "as if he was trying to regain control of the discussion," made remarks about keeping the debate professional and collaborative, then sat back down.
- Valandra concluded by stating that even though the meeting ended professionally with handshakes, Baptist remained unsatisfied with having to keep his program assistant on his program's payroll at 80-90% of the cost.

### Interview Overview— Periloux Peay's comments as Baptist's witness related to the alleged January 2025 Puerto Rico incident.

- Dr. Peay, a frequent research collaborator with Baptist and a Faculty member at the University of Maryland, College Park, attended the Southern Political Science Association conference in Puerto Rico in January 2025. Sitting about 10 feet from Baptist at a different table, he said he saw Baptist in a virtual call with "several University of Arkansas faculty, including Raines," but didn't recognize others. He also didn't know Raines, had never met or spoken to Him, and only learned it was Raines on the call after Baptist told him once the meeting concluded.
- Peay said he overheard what he described as a "problematic" comment made by Raines during the call. Though he didn't recall the exact words, he remembered it as something like "This is why people can't be trusted with leadership". He interpreted Raines's comment as being aimed at Baptist's leadership abilities, possibly related to his new role as head of



the African American Studies program, although he acknowledged not having heard the full context of the comment or the conversation.

- Peay said in a later discussion he had with Baptist on the same day, Baptist expressed feeling targeted because of his leadership role, noting that he is the only black faculty member in his department, and other diversity programs at the University (Latin American and Middle Eastern studies, etc.) were also facing similar pressures. Peay viewed these events as part of a larger national political trend affecting specific academic fields and scholars, rather than as isolated to the University of Arkansas, Fayetteville (UARK).
- Peay expressed that Baptist's situation with UARK is directly impacting their collaborative research, causing significant delays. He also voiced strong concerns about being targeted himself if he were identified as a witness, citing the current political climate's impact on academia. Therefore, he did not sign to confirm his statements and requested that his name be removed from this investigation.

**Summary of written information collected from Donna Johnson on October 14, 2025**

- Johnson, the Associate Dean of People Operations, confirmed that there were two meetings in January 2025 with Baptist and Raines, including a virtual meeting on January 6, 2025, and an in-person meeting on January 22, 2025, with her, Baptist, Raines, and Valandra. She attended both meetings to take notes and shared those notes, which verified statements made by Raines.

**Summary of written information collected from Bill Schreckhise on September 2, 2025**

- Dr. Schreckhise, Chair of the Department of Political Science, stated that the investigation into Baptist began around June 30, 2025, when he noticed suspicious timing in Baptist's expenses. He found that Baptist had claimed costs for a focus group scheduled for his wedding day (including facility rental and catering). After noticing this, he reported it through their chain of command to Associate Dean Stephanie Schulte, who reported it to Raines, who involved the university's legal counsel. He said Baptist had previously invited him to his wedding, but he didn't make the connection until he reviewed the expense reports for the alleged focus group.
- Schreckhise communicated that this was his first experience with such financial concerns involving faculty. However, he mentioned discovering another unrelated case of potential financial impropriety by a different faculty member shortly after raising concerns about Baptist, which he reported to the Associate Dean of that faculty member.
- Schreckhise was only aware of one race-related incident with Baptist—a Zoom-bombing during Baptist's September 2021 Constitution Day talk involving racial slurs. Schreckhise communicated being present, trying to prevent disruption, and apologizing for security lapses (Raines wasn't employed at UARK at the time). He knows of no other Title VII complaints by Baptist.

**Summary of information collected from Stephanie Schulte on September 3, 2025**



UNIVERSITY OF
ARKANSAS

*Equal Opportunity, Compliance, and Title IX*

- Dr. Schulte, Associate Dean of Social Sciences, communicated information regarding the Investigation of Baptist's expenditures, confirming that initial discovery occurred on June 23, 2025, when Schreckhise contacted her about suspicious expense reports from Baptist.
- Schulte was informed that Baptist submitted an expense report (ER-0000295869) claiming research expenses for an event on June 7, 2025, in Columbia, SC—the same date, time, and location as his wedding. The expenses totaled approximately $7,000 and included venue, catering, and VRBO rental costs.
- Schulte said she was required to report the suspicious charges under Arkansas Code Title 25, which mandates reporting unauthorized disbursements over $1,000 within five business days.
- Schulte noted that evidence gathered showed Baptist's wedding reception occurred on June 7, 2025, at the Gala Center in Columbia, SC, from 3-6 pm, supported by online invitations and social media, but Baptist claimed the same event was a research focus group with "approximately 75 research participants" for Blair Center work.
- Regarding Baptist's Internal Review Board (IRB) Protocol, Schulte noted that although he claimed to conduct human subjects research in SC (which required an IRB Protocol approval), Baptist had had no active IRB protocols since his previous one expired on April 20, 2024.
- Schulte reported conducting a thorough multi-day investigation involving college financial staff, grant administrators, Human Resources personnel, and research compliance officers to verify the suspicious charges and determine appropriate reporting requirements.
- Schulte has no knowledge of or documented incident reports that Baptist may have made in the past, connected to his current claims of discrimination based on race and retaliation. She was, however, involved in Baptist's attempt to fire his program assistant, Morgan Reese.

## Conclusion & Findings

**Disposition:** <u>No Violation</u> of Discrimination Policy - Fayetteville Policies and Procedures 214.1

In consultation with the University's Compliance Officer, Dr. Danielle L. Williams, and after carefully reviewing all of the information gathered during this review, I conclude, based on a preponderance of the evidence, that Dean Raines **did not violate** the University's Discrimination Policy - Fayetteville Policies and Procedures 214.1.

The evidence gathered during the investigation indicates that Dr. Baptist's claims against Dean Raines, alleging a pattern of discriminatory conduct resulting in retaliatory adverse actions, are unfounded.

In November 2024, Baptist alleged that Donna Johnson engaged in biased note-taking during meetings about Morgan Reese, the program assistant he wanted to fire. Raines stated he was unaware of this report, and OEOC can confirm that the report about Ms. Johnson was never shared with Raines.

UNIVERSITY OF
ARKANSAS

*Equal Opportunity, Compliance, and Title IX*

Baptist alleged that, in January 2025, Raines made a racially disparaging remark during a virtual meeting, stating, "black people are incapable of leadership." Witness Periloux Peay stated that he recalled hearing a "problematic" comment but could not confirm the exact words or context of the comment. Raines denied the allegation, saying his comments about leadership stress were misinterpreted. Johnson's notes from the virtual meeting between Raines and Baptist reflect that Baptist stated that he had been stressed by the situation with Ms. Reese, and that, in response, Raines reminded Baptist that his role requires understanding policies and managing stressful employee situations.

Raines said Baptist later admitted he misunderstood the comments made by Raines in the early January virtual meeting, as confirmed by Johnson's notes from the second meeting between Raines and Baptist, together with Baptist's comments on those notes:

Johnson meeting notes (excerpt):

> Dean Raines stated that he believed Dr. Baptist had the opportunity to give the dean's team his side of events over a long period of time. They talked about the quote that was an interpretation that went to the chancellor regarding stress. He said that when we get into leadership positions, we need to be the calmest person in the room. Dean Raines stated that his comment was misquoted to the chancellor. He reminded Dr. Baptist that he said "all managers need to learn to handle stressful employees."

Baptist reply comment (sticky note):

> I did not say this. The Dean did and I corrected him in him [sic] say "I needed to handle stress better" again which was heard by more than just me.

Johnson meeting notes (excerpt):

> Dr. Baptist expressed that he took expression to be about race because he was talking to a Black man in management. To imply he, as a Black manager, is not handling the stress of an employee.

Baptist reply comment (sticky note):

> I did not take the expression to be about race. I took it as ignoring my experiences as a Black manager.

Furthermore, Baptist presented an email he sent to Chancellor Charles Robinson in January 2025, which Baptist claimed was reporting Raines for this "racist remark," but the email shows something different. Instead, Baptist wrote to Chancellor Robinson, primarily addressing his ongoing concerns with the situation involving Ms. Reese, but at one point stating, "It is particularly



troubling to note that the Dean [Raines] has made disparaging statements suggesting that Black faculty did not know how to handle stress." This supports Raines' claim that Baptist's account of what Raines said at the early January virtual meeting has evolved over time, and that the assertion Baptist is now making that Raines made a racially disparaging statement about Black people (or Black faculty) is false.

Baptist claimed Raines offered him an endowment to appease him, implying guilt, but Raines said Baptist's nomination came from Baptist's own department and was based on merit—Raines was only responsible for accepting the recommendation and announcing the appointment. In June 2025, Baptist alleged that Raines made changes to appointments without consulting area studies group directors and refused to meet with them collectively. Raines explained that he met collectively with the area studies directors once, but later opted for separate group meetings due to differing needs from program to program. This appears to be a reasonable administrative decision, not discriminatory.

Other witness statements and documents further supported the findings. Dr. Valandra, whom Baptist brought for support, noted Raines' "patronizing tone" during a January 2025 meeting but confirmed he maintained professionalism after being confronted and never tied this to racial undertones as Baptist claimed. She also stated that Baptist became angry and frustrated during the meeting, particularly regarding Raines' decision to retain his program assistant, Morgan Reese.

On June 27, 2025, Baptist claimed that Raines used the word "civil" in an email, which he interpreted as racially charged. Raines defended his use of the term, explaining that it referred to the importance of civil discourse. Baptist submitted this email as evidence. His interpretation of Raines's use of the word "civil" is subjective, unreasonable, and not indicative of discrimination. Raines used "civil" to describe the communication as polite and professional, addressing concerns about tone raised by Baptist in the email exchange.

On July 3 and July 11, 2025, Baptist alleged retaliation during two meetings where he says Raines accused him of financial misconduct, made racially charged remarks, and threatened termination, among other things. Raines stated he was obligated to investigate financial improprieties reported to him by Bill Schreckhise and Stephanie Schulte, who found evidence indicating that Baptist claimed research expenses for an event coinciding with his wedding and lacked IRB approval for human-subject research.

Witnesses, including Schreckhise and Schulte, corroborated Raines' account of what initiated the investigation and when Raines became involved, and no evidence supported Baptist's claims of racial bias or harassment. Additionally, the content of both meetings was reflected in meeting outlines provided by Raines and in audio recordings by Baptist; the outlines and recordings are consistent, and a reasonable person would conclude that Raines acted within his legal and professional obligations, and not in a manner that reflected racial discrimination or retaliation. The



meeting audio also confirms Raines made no disparaging remark about black churches, nor did he call Baptist "unethical and immoral."

In conclusion, the investigation found that Baptist's allegations of discrimination and harassment are false. Witness statements, audio recordings, meeting notes and scripts, and financial records consistently supported Raines' account and demonstrated that his actions complied with university policies and state law. A reasonable person would conclude that Baptist's allegations against Raines were likely motivated by dissatisfaction with Raines' refusal to support the firing of his program assistant, Morgan Reese, and the subsequent financial investigation.

## Recommendation

As the investigation concluded that Baptist's allegations of discrimination and discriminatory harassment are false, no further action towards Dean Raines would be appropriate. Dr. Baptist should be reminded of the expectations outlined in the University's *Code of Ethical Conduct* (Board of Trustees Policy 335.1), which requires honesty and fairness in all matters and emphasizes that allegations should be based on factual information. Dr. Baptist should also be advised to remain mindful of these standards when reporting future concerns to maintain the integrity of the reporting process.

**Attachments:**
- Najja Baptist, meeting summary & evidence
- Brian Raines, meeting summary & evidence
- Periloux Peay, meeting summary
- Dr. Valandra, meeting summary
- Stephanie Schulte's information
- Bill Schreckhise's information
- Donna Johnson's information

Cc:
Jim Gigantino, Sr. Vice Provost for Academic Affairs